Ex parte Charaka
**DHARMAGUNARATNE, Appellant.**

Ex parte Mickey Joel **FISHER,**
**Appellant.**

**Nos. 2–95–231–CR, 2–95–233–CR.**

Court of Appeals of Texas,
Fort Worth.

June 27, 1997.

Rehearing Overruled Sept. 4, 1997.

Thomas E. Myers Rohne, Hoodenpyle, Lobert & Myers, Arlington, Larry M. Moore, Law Office of Larry M. Moore, Fort Worth, for Appellant.

Tim Curry, Criminal District Attorney, Charles M. Mallin, Chief of the Appellate Section, David M. Curl, Assistant Criminal District Attorney, Fort Worth, Texas John B. Holmes, Jr., District Attorney Harris County, William J. Delmore, III, Assistant District Attorney Harris County, Houston, Matthew W. Paul, State Prosecuting Attorney, Austin, for Appellee.

## OPINION ON REHEARING

RICHARDS, Justice.

Having considered the issues presented in this appeal en banc after granting the State's motion for rehearing, we withdraw our prior opinion and judgment of June 27, 1996, and substitute this opinion and judgment in its place.

This is an appeal from a pretrial writ of habeas corpus filed in the district court below. In their sole point of error appellants Charaka Dharmagunaratne and Mickey Joel Fisher invite us to declare the so-called "Trial Court C"[1] of Tarrant County unconstitutional given the manner of its creation and operation and to find that the judicial assignments made to that court are done in violation of statutory authority.

We will affirm the district court's decision denying appellants' requested relief.

### Background

Appellants were indicted by a Tarrant County grand jury for the offense of possession of a controlled substance with the intent to deliver. Their cases were filed in the 297th District Court and were thereafter sent to Tarrant County's Trial Court C. Appellants filed pretrial applications for writ of habeas corpus in the 297th District Court of Tarrant County, alleging that Trial Court C was unconstitutionally created and lacked the jurisdiction of a district court. The elected judge of Criminal District Court Number Three, Judge Don Leonard, sitting for the 297th District Court, considered the writ applications and, following a lengthy hearing, ultimately denied appellants' request for the

1. Often also referred to in the record as "Trial Room C." We will use the term "Trial Court C" throughout this opinion. We attach no significance to the term.

ordered return of both cases to the 297th Judicial District Court for trial.

The applications included the following argument: "This writ application is intended only as a challenge to the constitutionality, jurisdiction, and operations of Trial Room 'C', a/k/a Trial Court 'C', and to the judge assigned to sit in such Court."

### Constitutional and Statutory Claims

We begin our analysis of appellants' constitutional claims by looking to the administrative assignment of the presiding judge.

Appellants' cases were filed in the 297th District Court for Tarrant County and were subsequently sent, along with other cases, to Trial Court C. Judge James Walker, a Former District Judge of the 286th District Court, was assigned to the 371st District Court for Tarrant County by Judge Clyde R. Ashworth, Presiding Judge of the 8th Judicial Administrative District.

■ Under well-settled case authority, the proper assignment of Judge Walker to the 371st District Court authorized him to sit in the other district courts of Tarrant County, including the 297th District Court. Judges sitting by assignment may be properly authorized to preside over more than one court in a county. *See Zamora v. State*, 508 S.W.2d 819, 823 (Tex.Crim.App.1974); *Gregory v. State*, 495 S.W.2d 891, 892 (Tex.Crim. App.1973). If properly assigned to one district court, the judge is authorized to preside in other district courts of the same county. *See Peach v. State*, 498 S.W.2d 192, 194 (Tex.Crim.App.1973), *overruled on other grounds, Jackson v. State*, 548 S.W.2d 685 (Tex.Crim.App.1977); *Pendleton v. State*, 434 S.W.2d 694, 697 (Tex.Crim.App.1968). Moreover, a judge sitting by assignment may preside over a court regardless of whether the regular district judge of that court was present and trying another case at the same time. *See Hughes v. State*, 897 S.W.2d 285, 306 (Tex.Crim.App.1994), *cert. denied*, 514 U.S. 1112, 115 S.Ct. 1967, 131 L.Ed.2d 857 (1995); *Zamora*, 508 S.W.2d at 823; *Reed v. State*, 500 S.W.2d 137, 138 (Tex.Crim.App.1973), *overruled on other grounds, Ex parte Taylor*,

522 S.W.2d 479 (Tex.Crim.App.1975); *Gregory*, 495 S.W.2d at 892.

The record reflects Trial Court C is a fully staffed courtroom where judges sitting by assignment in Tarrant County hear some of the cases filed in Tarrant County district courts, including Criminal District Court Numbers One, Three, Four, the 213th District Court, the 297th District Court, the 371st District Court, and the 372nd District Court. The fact that the elected judges of the courts may be presiding in other courtrooms at the same time an assigned judge may be presiding in another courtroom is of no legal consequence. *See Peach*, 498 S.W.2d at 195.

■ Appellants acknowledge the unbroken history of appellate decisions upholding the viability of using visiting judges in courts such as Trial Court C, whether they be called "impact courts," "annex courts," "trial courts," or "auxiliary courts." *See, e.g., Hunnicutt v. State*, 523 S.W.2d 244, 245 (Tex. Crim.App.1975) (conviction from a so called "Impact" district court in Dallas County upheld after rejection of contention that such courts are unconstitutional). Nevertheless, appellants strongly urge this court to find that the appellate record in this case shows that Trial Court C was intended to operate, and continues to operate, as a permanent and fully operational district court, in significant contrast to the prior cases. They point to the following language in the Court of Criminal Appeals opinion in *Ex parte Holmes*, 754 S.W.2d 676 (Tex.Crim.App.1988), in support of their claim that a permanent system of administrative judicial assignments to such courts is far different than temporary administrative assignments:

The contention on appeal in many of these cases has been that these were not legislatively created courts and thus invalid. In rejecting this contention the court has upheld the temporary administration assignment of a judge to a district court where the regular judge was present, but has not held that such practice constituted the establishment of a valid annex or impact court, or whatever local term was used for convenience in various counties.

The word "establish" is used in the second sentence of [section] 24.961 as well as in [a]rticle V, [section] 1, Texas Constitution, with regard to the establishment of courts. The Reader's Digest Great Encyclopedic Dictionary including Funk [and] Wagnalls Standard College Dictionary defines "establish" as "1. To make secure, stable, or permanent, fix firmly in a particular place or condition. 2. To set up, found, or institute on a firm or lasting basis...."

The words and phrases within a statute must be read in the context in which they are used. V.T.C.A., Government Code, § 311.011(a). The word or phrase must then be construed according to the rules of grammar and common usage. *Id.*

It can hardly be said that a temporary administrative assignment of a judge for a week or two to a district court in Harris County, whether the regular judge is present or not, "establishes" another court, whether annex or branch, or of any other kind.

*Id.* at 682 n. 5.

Tarrant County's Trial Court C *is* clearly more than a temporary courtroom where visiting judges sometimes sit pursuant to administrative assignments. The record presented by appellants shows it was established and funded to operate full-time. The Texas Legislature had no involvement in its creation; instead, it was created by a combination of state executive and judicial authorities, and has been funded through yearly renewable grants by the Criminal Justice Division of the Governor's Office since its creation in 1991. It is located in a permanent courtroom in the courts building and and has its own full-time bailiffs, court reporter, court coordinator, and probation officers.

Nevertheless, we must acknowledge that the cases are properly assigned by valid district judges to visiting or retired judges sitting by proper assignment in their place. The vexing question presented to us is not whether such assignments are made to Trial Court C on a full-time basis; clearly they are. Rather the critical question is whether Trial Court C constitutes an unconstitutionally established court, such that the judicial assignments to it are unconstitutional and violate our separation of powers.[2] On the basis that properly assigned judges may sit for other judges within the county, we hold that Judge Walker was properly authorized, pursuant to his administrative assignment, to preside over appellants' cases in the 297th District Court, regardless of whether the place of the trial was designated as Trial Court C. We believe any authority to the contrary, including the language cited above in *Ex parte Holmes*, is mere dictum and accordingly is not controlling.

■ We also reject appellants' contention that Trial Court C operates in violation of the Government Code because it receives cases from other district courts within days or weeks after indictment. Sections 74.052 and 74.056(a) of the Code authorize the presiding judge of the administrative region to assign judges when necessary to dispose of "accumulated business." TEX.GOV'T CODE ANN. §§ 74.052, 74.056(a) (Vernon 1988). We do not read the words "accumulated business," as requiring the cases to be a specific age in order to qualify for disposition by an assigned judge. Rather, we hold cases may constitute "accumulated business," the day they are filed in the assigning court.

2. The dissenting opinion addresses issues not presented in appellants' writs, using evidence which is not supported by the record. One example is the dissent's focus on the statistical reporting requirements inherent in the state's grant application. The dissent states "[Trial Court C's] continued existence is contingent upon the forfeiture of sufficient property, the ratio of convictions to acquittals, and the average length of sentence." The record, however, shows only that such statistical records are kept and used as measures of success, not that funding is dependent on those factors. This same statistical information is kept on all other district courts. *See* OFFICE OF COURT ADMINISTRATION, TEXAS JUDICIAL SYSTEM ANNUAL REPORT: STATE FISCAL YEAR 1996, pp. 186–297. Moreover, the appellants did not raise this issue in their writs and, on appeal, allege only that such measures are unconstitutional because they violate our separation of powers. They do not contend the compilation of such information raises questions about the neutrality and impartiality of the assigned judges.

## Notice Claims

■ Appellants also contend the assignment of cases by the district courts of Tarrant County to Trial Court C denies them due process and effective assistance of counsel because counsel often do not know which judge will preside until the day the case is actually called for trial. Appellants argue that advance knowledge of who the presiding judge will be is often essential to such decisions by a defendant as to what plea he will enter, and whether he should elect the judge or jury to assess punishment. This contention was specifically rejected by this court in *Williams v. State,* 746 S.W.2d 333, 335 (Tex. App.—Fort Worth 1988, pet. ref'd), and by a sister court of appeals in the context of a civil appeal involving similar contentions. *See Turk v. First Nat'l Bank of West Univ. Place,* 802 S.W.2d 264, 265 (Tex.App.—Houston [1st Dist.] 1990, writ denied). Section 74.053 provides that the presiding judge shall, if it is reasonable, practicable, and time permits, give notice of the assignment to each attorney in the case. Tex.Gov't Code Ann. § 74.053 (Vernon Pamph.1997). The record reflects that assignments made to judges who hear cases in "Trial Court C" are made on the Thursday or Friday before the Monday of docket call.

■ To the extent that appellants contend the assignment made in the instant case deprived them of adequate notice, we hold those claims are premature. A court should not grant habeas corpus relief when there is an adequate remedy by appeal. *See Ex parte Hopkins,* 610 S.W.2d 479, 480 (Tex. Crim.App.1980); *Ex parte Wilhelm,* 901 S.W.2d 956, 957 (Tex.App.—Houston [1st Dist.] 1995, pet. ref'd); *Ex parte Benavides,* 801 S.W.2d 535, 537 (Tex.App.—Houston [1st Dist.] 1990, writ dism'd w.o.j.). Exceptions to this rule are reserved to cases where the defendant asserts legal challenges which, if successful, would totally bar prosecution. *Wilhelm,* 901 S.W.2d at 957. We cannot conclude, based on the pretrial habeas record before us, that the assignment of Judge Walker denied appellants due process of law because of an alleged late notice of the assignment. For example, it would be within

the authority of the elected judge of the 297th District Court, Judge Everett Young, to preside over appellants' future trials, in which case appellants' notice claims concerning Judge Walker's assignment would be moot. For the same reason, we believe any complaints concerning the alleged lack of control to be exercised in the future by the elected district judges over the conduct of judges sitting by assignment are also premature.

Appellants' point of error is overruled and the trial court's denial of habeas relief is affirmed.

DAUPHINOT, J., filed a dissenting opinion in which HOLMAN, J., joins.

DAUPHINOT, Justice, dissenting on rehearing.

The majority has found that a full-time district court, created by the executive branch to complement the work of the Narcotics Task Force by "collecti[ng] ... increased fines [which] will act as a deterrent, as will the imposition of sentences requiring confinement," [1] and dependent upon the ratio of convictions to acquittals and dismissals, the value of property forfeited, and the average length of sentence for its continued existence, does not operate in violation of any constitutional strictures because the administrative judge has the authority to assign visiting judges to hear the accumulated business of the legislatively created courts. I cannot agree.

Trial Court C is not an annex or impact court to which the judge of a legislatively created court sends specific cases for trial. Cases are sent to Trial Court C as though it were an independent, legislatively created court. The cases before us were carried on Trial Court C's docket (not that of the 297th District Court) for approximately six months and handed off from visiting judge to visiting judge without any exercise of authority by the elected judge. The defendants never appeared before the elected judge.

The disturbing record before us reveals, as the majority points out, a full-time court that

[1]. Def. Ex. 1 at 26.

is "located in a permanent courtroom in the courts building and has its own, full-time bailiffs, court reporter, court coordinator, and probation officers."[2] As the majority notes, this court "was established and funded to operate full-time. The Texas Legislature had no involvement in its creation...."[3] But the majority then holds that in determining whether Trial Court C constitutes an unconstitutionally established court, we look only to whether the judge was properly assigned to preside over Appellants' cases in the 297th District Court. I respectfully submit that this approach avoids the issues actually presented to us:

- Whether a fully-functioning district court, created by the commissioners' court at the request of the district attorney's office for the purpose of assisting the district attorney's office in its prosecution of drug cases, and operating on a full-time basis with judges who are appointed and never elected, was created in violation of constitutional mandates requiring legislative creation of district courts, separation of powers, and elected judges;

- Whether a full-time district court, whose function is to assist the district attorney's office in the prosecution of drug offenses; whose continued funding depends on
  - ◆ the ratio of convictions to acquittals and dismissals,
  - ◆ the average length of sentences (incarceration rather than probation), and
  - ◆ the value of property forfeited;

  and whose operation is exclusively carried out by appointed judges, violates the State and U.S. Constitutions and the laws of this state; and

- Whether Appellants' challenge to "any judges assigned to sit and preside in such Court" should be sustained.[4]

### RIPENESS FOR REVIEW

A criminal defendant is entitled to due process, equal protection, and a fair, detached, and neutral magistrate in a court of competent jurisdiction. These rights are constitutional rights guaranteed by both State and U.S. Constitutions.[5] A criminal defendant is also entitled to these rights by statutory provision.[6] The operation of Trial Court C violated Appellants' rights to due process, equal protection, and a fair, neutral, and detached magistrate in a court of competent jurisdiction.

According to Leslie J. Smith, the Criminal Justice Manager for the Tarrant County Administrator, the grant providing funds for Trial Court C is "renewable at the end of each year based on your progress reports and how well you are operating your particular court."[7] Smith's testimony confirms that the conviction rate is one of the factors used in determining the success of Trial Court C.[8]

The El Paso Court of Appeals was recently presented with a record similar to the record before us.[9] The Court was asked to determine whether a criminal defendant should be allowed a hearing on a motion to recuse the

---

2. Op. at 143.

3. *Id.*

4. The majority holds that "Judge Walker was properly authorized, pursuant to his administrative assignment, to preside over appellants' cases in the 297th District Court, regardless of whether the place of the trial was designated as Trial Court C." Op. at 143–144. I would point out that the record does not reflect that Judge Walker was ever assigned "to preside over appellants' cases in the 297th District Court." I do not understand why the majority rests its decision on the fact that Judge Walker was properly assigned to the 371st District Court and Criminal District Court No. 4 because there is no evidence Judge Walker would hear Appellants' trials. One of the

problems pointed out by Appellants is the impossibility of knowing who the trial judge will be in time to challenge that judge.

5. *See* U.S. CONST. amends. V, VI, and XIV; TEX. CONST. art. 1, § 19.

6. *See* TEX.CODE CRIM.PROC.ANN. art. 1.04 (Vernon 1977).

7. Smith's Test., R. at 48 (all record citations are to the records of both appellants unless otherwise noted).

8. *See id.* at 56.

9. *See Sanchez v. State*, 926 S.W.2d 391 (Tex. App.—El Paso 1996, pet. filed).

judge of a special drug impact court. The State argued that no evidentiary hearing was necessary because recusal was not an appropriate vehicle for challenging institutional bias and because the recusal motion could be properly determined as a matter of law. The El Paso Court disagreed. It pointed out that although the recusal motion contained a due process challenge, that challenge did not make the recusal motion an inappropriate means for challenging the individual judge.[10] The Court further noted that the recusal motion alleged that the impact court's funding depended on the rate of convictions it obtained.[11] The Court then gave its opinion regarding this scheme:

> If this is true, it raises very serious questions about the neutrality and impartiality of *any* judge assigned to preside over such a court, and deriving income from such assignment. We find no authority that suggests a funding scheme favoring convictions which would affect all judges assigned to that court would not be the proper subject of a recusal motion.
>
> . . . .
>
> . . . . As the state suggests, it is true that impact courts have withstood constitutional challenges. A review of these cases, however, does not reveal that the particular issue here has been settled: that is, no court has held that an impact court with a single judge sitting by permanent assignment, and dependent upon a conviction rate for his income, is a neutral jurist untouched by any appearance of impropriety as a matter of law. Rather, these cases have simply held that impact courts are constitutionally permissible extensions of the district courts they serve.[12]

In the cases before us, the majority holds that "[t]o the extent that appellants contend the assignment made in the instant case deprived them of adequate notice, we hold

those claims are premature. A court should not grant habeas corpus relief when there is an adequate remedy by appeal."[13]

But Appellants challenge much more than the timeliness of the assignment of the judges. They challenge the constitutionality and legality of the operation of the court, the creation of the court, and all judges sitting in the court. Respectfully, I would point out that the majority does not address most of the complaints raised by Appellants. If it does not address them because it believes they are premature, my response is that a constitutional challenge to the creation, operation, and use of a trial court raises jurisdictional as well as due process concerns, and I see no need to force defendants to appeal such matters separately when they are so inextricably intertwined.

Unlike the appellant before the El Paso Court, the two appellants here have not filed a motion to recuse. Both appellants did, however, "challenge . . . any judges assigned to sit and preside in" Trial Court C in their applications for writ of habeas corpus. Ouida Stevens, Administrative Assistant for the Eighth Judicial Region, testified that judges of Trial Court C were not appointed until the end of the week preceding their service:

> Q. I think you said that whenever the assignment is made—State's Exhibit 10. When that assignment is made, it designates that the 371st District Court is the court that Judge Walker would be assigned to. How does he know he is supposed to go to Trial Room C on Monday morning, as opposed to going to the courtroom for the 371st?
>
> A. They usually come to my office and sign their papers on Friday and I will tell them verbally what court they will be in on Monday.[14]

Given the last-minute assignments and the throng of judges presiding in Trial Court C,[15]

---

10. *See id.* at 395.

11. *See id.* at 396.

12. *Id.*

13. Op. at 144.

14. Stevens's Test., R. at 217–18.

15. Stevens testified about the multitude of judges moving into and out of Trial Court C during the months relevant to Appellants' cases. To put Steven's testimony in perspective, it appears that Judge Thornton "sat in" during the last week of September 1994, the week Fisher's case arrived at Trial Court C, but it is unclear whether he was specifically assigned to Trial Court C. In any event, Fisher's case was then passed off to a

it is difficult to understand how a motion to recuse could have been made, heard, and ruled on before a forward, backward, or lateral pass was completed. Appellants challenged the judge in the only way they could, and their challenges should have been addressed by this court, if we could have determined which judge or judges were being challenged.

Double jeopardy is reviewable pretrial because of the "constitutional right not to be *exposed* to double jeopardy." [16] By analogy, a criminal defendant also has a constitutional right not to be tried by a judge whose impartiality and appointment are at issue and judged by a court whose legal existence and operation are at issue, only to repeat the entire experience after the court and its decisions are found void. As the U.S. Supreme Court pointed out almost twenty-five years ago, "[Defendants are] entitled to a neutral and detached judge *in the first instance.*" [17] I believe that due process also entitles them to a constitutionally valid court in the first instance.

Furthermore, due process concerns are not anticipatory merely because they are raised pretrial. In *Estes v. Texas,* the U.S. Supreme Court addressed the question of whether pretrial hearings can be considered in determining whether a defendant's trial was conducted in a manner which "comports with the due process requirement of the Fourteenth Amendment." [18] The Court declared that due process requirements *do* attach pretrial.[19]

The primary duty of the judge in a criminal case is to see that justice is done by assuring a fair trial with constitutional and statutory guarantees of due process.[20] This duty encompasses more than protecting against double jeopardy.

The Texas Court of Criminal Appeals has held that

[a] defendant must not needlessly be denied due process by a trial court and suffer the emotional rigors and expense of a criminal trial, and possibly incarceration pending appeal only to be afforded due

series of judges designated to sit for the 371st. Judge Ashley somehow received the case, then he passed it to Judge Driver, who received Dharmagunaratne's case and passed both to Judge Walker, who passed them back to Judge Ashley, who passed them to Judge Thornton, who passed them from himself sitting in the 371st in the last week of October to himself sitting in Criminal District Court No. 4 in November and then back to himself sitting in the 371st in December, and then in January on to Judge Burdock sitting in Criminal District Court No. 4, who passed them back to Judge Walker, who returned them to Judge Burdock, who sent them back in February to Judge Ashley sitting in the 371st, who passed them back to Judge Driver, who passed them to Judge Davis, who passed them to Judge Perez, who passed them to no one, sitting in no court, for the first week of March.

This empty court passed the cases back to Judge Perez sitting in Criminal District Court No. 4, who passed them back to Judge Burdock. Fisher's writ of habeas corpus was granted March 23, 1995, while Judge Burdock was sitting in Trial Court C. Judge Burdock then passed Dharmagunaratne's case back to Judge Davis, who returned it in April to Judge Burdock sitting in the 371st. Dharmagunaratne's writ of habeas corpus was granted April 3, 1995, while Judge Burdock was sitting in Trial Court C.

16. *Ex parte Robinson,* 641 S.W.2d 552, 555 (Tex. Crim.App. [Panel Op.] 1982) (citing *United States v. Hollywood Motor Car Co.,* 458 U.S. 263, 266, 102 S.Ct. 3081, 3083, 73 L.Ed.2d 754, 757

(1982)). Double jeopardy complaints may be waived if raised untimely. *See Casey v. State,* 828 S.W.2d 214, 218 (Tex.App.—Amarillo 1992, no pet.); *United States v. Gordy,* 526 F.2d 631, 635 n. 1 (5th Cir.1976). If Appellants had not raised their complaints pretrial, then they, too, would have been waived, and not properly before us on appeal.

17. *Ward v. Village of Monroeville,* 409 U.S. 57, 61–62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267, 272 (1972) (emphasis added).

18. *Estes v. State,* 381 U.S. 532, 535, 85 S.Ct. 1628, 1629, 14 L.Ed.2d 543, 546 (1965).

19. *See id.*

20. *See* U.S. Const. amends. V, VI, and XIV; Tex. Const. art. 1 § 19; *Estes,* 381 U.S. at 539–40, 85 S.Ct. at 1631, 14 L.Ed.2d at 548–49; *see also Indemnity Ins. Co. of N. Am. v. McGee,* 163 Tex. 412, 356 S.W.2d 666, 668 (1962) ("The judiciary must not only attempt to give all parties a fair trial, but it must also try to maintain the trust and confidence of the public at a high level"); *Tyler v. Phelps,* 643 F.2d 1095, 1100 (5th Cir. 1981), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1992, 72 L.Ed.2d 455 (1982) (even though judges have broad discretion to give jury charges, if charge error is so egregious that it "deprive[s] the defendant] of a fair and impartial trial," then it violates due process).

process months or even years later by an appellate court.[21]

I believe that the appellants' claims are ripe for review, and that a writ of habeas corpus is a proper vehicle by which to obtain that review.

### OPERATION OF TRIAL COURT C

Appellants claim that Trial Court C operates unconstitutionally because its judges are appointed, not elected, and because it operates as a de facto, permanent, fully functioning district court. They also claim that it operates in violation of Texas statutes. I would hold that the operation of Trial Court C violated the appellants' due process and equal protection rights and that it therefore violates the U.S. Constitution, the Texas Constitution, and Texas statutes.

### Autonomy of Trial Court C

Trial Court C operates permanently and independently of any legislatively created district court. The majority points out that the record shows Trial Court C "*is* clearly more than a temporary courtroom where visiting judges sometimes sit pursuant to administrative assignments. The record presented by appellants shows it was established and funded to operate full-time." [22]

The Texas Court of Criminal Appeals has rejected a contention that an impact or annex court was improperly created by holding that "a temporary administrative assignment of a judge for a week or two to a district court ... [does not] 'establish' another court." [23] The clear implication of *Holmes* is that a court which is "established" is improperly created and invalid.

The majority agrees that a "critical question is whether Trial Court C constitutes an unconstitutionally established court, such that the judicial assignments to it are unconstitutional...." [24] But without dealing with

this issue, the majority reverses the analysis and finds that because the judges were properly assigned, it does not matter whether Trial Court C is an unconstitutionally established court. The majority states, "We believe any authority to the contrary, including the language cited above in *Ex parte Holmes,* is mere dictum and accordingly is not controlling." [25]

The record shows that Trial Court C operates as an independent court, subject only to a determination of whether it has fulfilled its mandate by having the proper ratio of convictions to acquittals and dismissals, average sentences of a sufficient length, and forfeitures of sufficient dollar amounts. There is no suggestion in the record that the judges assigned to Trial Court C really sit for the judge of the court to which they are ostensibly assigned. Nor is there any suggestion that they exchange benches with another judge when they hear cases from another court.

Cases appearing on Trial Court C's docket are sent to Trial Court C, not to other legislatively created courts. Trial Court C has its own independent docket.[26] The record reflects that Appellants were both carried on the docket of Trial Court C for about six months with no indication that any legislatively created court had jurisdiction over them. And although the first page of the docket sheet contains what purports to be the signatures of the elected district judges hearing criminal cases, the testimony of Rachel Flores, Court Coordinator of Trial Court C, revealed that these signatures were merely stamped on the docket sheet by an auxiliary court coordinator; there is no indication that these names were stamped with the consent of or at the direction of any elected trial judge.[27] In fact, all documents relating to Appellants' cases show Trial Court C as the only court of jurisdiction. The docket setting even instructed them that if they

---

**21.** *Henley v. State,* 576 S.W.2d 66, 73 (Tex.Crim. App.1978).

**22.** Op. at 143.

**23.** *Ex parte Holmes,* 754 S.W.2d 676, 682 n. 5 (Tex.Crim.App.1988).

**24.** Op. at 143.

**25.** Op. at 143.

**26.** *See* Def. Ex. 33; *see also* Def. Ex. 8 at 2 (page one of Commissioners' Court Communication).

**27.** *See* Flores, Test., R. at 150–51; Def. Ex. 29.

appeared for docket call and it was determined that their case would not be reached, it would not be necessary for either the attorney or the defendant to appear on the trial date "unless directed by the Court."[28]

The record reflects that once Appellants' cases were sent to Trial Court C, they were no longer carried on the docket of the 297th District Court.[29] The transfer of Appellants' cases to Trial Court C was accomplished by memorandum.[30]

Sara Riley, Court Coordinator for the 297th, testified to the independent operation of Trial Court C regarding cases sent to that court from the 297th:

> Q. When you do the assignment to Trial Room C, the way I understand it is, you do the memorandum to the clerk and to Rachel Flores, the coordinator of Trial Room C, indicating that basically these cases need to be transferred to Trial Room C for disposition; is that right?
>
> A. That's true.
>
> Q. Are there any other documents that you send with the case filing—excuse me—with the assignment memorandum?
>
> A. I send the case cards.
>
> Q. And that's a computer-generated card that you, as coordinator, use to document the settings and the cases and things like that?
>
> A. That's true.
>
> Q. I take it you just send that down to Rachel Flores in Trial Room C for her use.
>
> A. Yes.
>
> Q. When you send the case down to Trial Room C or when it's assigned to Trial Room C, do either you or Judge Young send any instructions as for what purpose the case is being sent, whether it's being sent for purposes of trial or plea or hearing on a motion to suppress or anything like that?
>
> A. No.

> Q. The case is just kind of sent down in toto for Trial Room C to dispose of as they dispose of it?
>
> A. Yes.
>
> Q. Do you maintain any supervision over those cases in Trial Room C after you assign it to Trial Room C for disposition?
>
> A. No.
>
> Q. Are you provided some kind of summary or report regarding the dispositions of the cases that have been assigned from the 297th down to Trial Room C?
>
> A. We used to receive a monthly report, but I haven't seen one in quite some time. And those were only numbers; they weren't case-by-case listings.
>
> Q. So you don't receive back an individual report on each case saying this is what occurred in this particular case or anything like that?
>
> A. No.
>
> Q. Once the case has been assigned to Trial Room C by you, generally, you have nothing further to do with it unless there is some request that is made to bring it back or something like that?
>
> A. That's true.[31]

The record reveals that the memorandum serves the same purpose as a motion to transfer and that the two cases before us were effectively transferred to Trial Court C. Neither Dharmagunaratne nor Fisher was ever set for hearing before the elected trial judge of the 297th District Court, Criminal District Court No. 1, or Criminal District Court No. 3. The only court appearances reflected in the record for Appellants are in Trial Court C, except for the hearing on the applications for writ of habeas corpus, which took place in Criminal District Court No. 3.

Although Appellants' cases were included in the final numerical statistics for the 297th, the 297th District Court did not retain their case files, did not order any court settings, did not instruct any visiting judge as to their

---

28. *See* Def. Ex. 29.

29. I would point out that Appellants' cases were not part of the accumulated business of the 297th District Court; they were both newly indicted cases. Interestingly, in May 1995, not more than six weeks after Appellants' writs were filed, 874 cases were already on Trial Court C's docket.

30. *See* Sara Riley, Test., R. at 111–12.

31. *Id.* at 112–14.

cases, did not reset their cases, and did no other act that a presiding judge would do in relation to a case on that judge's docket. All such actions were carried out by the judges of Trial Court C. The cases appeared on the docket of Trial Court C,[32] the judge of Trial Court C added conditions to Fisher's bond,[33] and motions in both cases were disposed of in Trial Court C.[34]

In fact, should either case have been disposed of by Trial Court C, the judge of the 297th would not have been made aware of the outcome of the case or even the fact of its disposition. The case would simply be reflected in the raw numbers reflecting total dispositions of the 297th District Court.

I would not require an elected judge to sit in the courtroom of a visiting judge in order to control the case. I do not deny the right of district judges to exchange benches. Nor do I question the authority of the administrative judge to assign visiting judges. I also do not question the principle that a properly assigned visiting judge has all the power and authority of the district judge for whom (s)he is assigned to sit.

But the facts before us clearly show that the elected judge of the 297th not only exercised no control or oversight over the two cases before us; he was not kept informed of the actions taken and the cases' progress through the court.[35]

It is a fact that the cases did not appear on his docket, that he received no status reports, and that no paperwork of any kind regarding the cases was returned to his court. Only two people claimed control over operations of Trial Court C—Criminal Justice Manager Leslie J. Smith and Court Coordinator Rachel Flores—neither of whom is or was a judge, elected, appointed, or designated.

Instead of controlling the cases in question, the judge of the 297th surrendered his responsibility over the cases to Trial Court C, as though it too were a fully functioning court. The reality of the situation is that when the judge of the 297th sends, transfers, or assigns a case to Trial Court C, he effectively relinquishes control over that case and delegates to Trial Court C's court coordinator his responsibility to see to it that the case is disposed of expeditiously and his duty to control the proceedings so that justice is done.[36]

Under the U.S. Constitution,[37] the Texas Constitution,[38] and the Texas statutes,[39] an elected judge cannot properly delegate all authority and responsibility regarding a felony case.[40] The improper delegation of authority and responsibility from the 297th District Court resulted in absolute autonomy of Trial Court C in handling Appellants' cases.

**32.** *See* Trial Docket in Setting Sequence, Def. Ex. 29 at 4–5.

**33.** *See* Certificate of Proceedings, Def. Ex. 28 at 23.

**34.** *See* Def. Ex. 27 at 8, 10; Def. Ex. 34 at 28–29, n. 15 *infra* (showing that Judge Thornton was assigned to Trial Court C on December 20, 1994, when he signed the interlocutory default judgment).

**35.** *See* Riley, Test., R. at 113–14.

**36.** *See* Tex.Gov't Code Ann. § 21.001 (Vernon 1988).

**37.** *See* U.S. Const. amends. V, XIV, § 1.

**38.** *See* Tex. Const. arts. I, § 19, V, § 8 ("District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law ...").

**39.** See Tex.Code Crim.Proc.Ann art. 4.05 (Vernon Supp.1997) (District courts and criminal district courts have original jurisdiction in felony cases); Tex.Gov't Code Ann § 21.001(b) (Vernon 1988).

**40.** *See, e.g.,* probation revocation cases decided under former article 42.12 (amended effective 9/1/93) of the Texas Code of Criminal Procedure in which courts held that the trial court's delegation of its duty to set the conditions for probation was impermissible and constituted reversible error. *See Lemon v. State,* 861 S.W.2d 249, 252 (Tex.Crim.App.1993); *DeGay v. State,* 741 S.W.2d 445, 449 (Tex.Crim.App.1987); *Jones v. State,* 571 S.W.2d 191, 193 (Tex.Crim.App. [Panel Op.] 1978). *See also* juvenile cases in which courts have held that the trial court cannot delegate its duty to admonish the juvenile to the juvenile's attorney or to the prosecutor, and that the trial court's failure to give the admonishments is reversible error. *See In re A.L.S.,* 915 S.W.2d 114, 117 (Tex.App.—San Antonio 1996, no writ), and cases cited therein.

Appellants' cases were transferred to a fully functioning court for all purposes. By ceding all responsibility for these cases, the legislatively created court allowed Trial Court C to function in all ways as an independent court. This de facto creation of an executively established court violated Appellants' due process rights, equal protection rights, and the separation of powers as guaranteed by the U.S. Constitution [41] and the Texas Constitution.[42]

### The Funding of Trial Court C

Appellants ask us to hold that the funding of Trial Court C renders its creation and method of operation unconstitutional. They point out that while the apparent lack of oversight of Trial Court C in relation to their cases is disturbing, the conditions for continued funding of Trial Court C are even more alarming.

The grant application and testimony at the writ hearing make it clear that the intent in creating Trial Court C was to create a fully operating district court in all functions, except that it would be staffed by judges appointed by the presiding judge of the judicial region and that it would handle the Narcotics Task Force cases and all drug seizure and forfeiture cases. The court budget even included funds for seminars for the judges of Trial Court C. According to the grant documents, Trial Court C was to "complement" the work of the "multi-agency inter-jurisdictional Narcotics Task Force by providing a judicial forum in which drug cases are tried expeditiously." [43]

Additionally, the Commissioners' Court, in its grant documents, continually refers to Trial Court C as a permanent court:

- "This court is being relocated to the new criminal courts building. . . ."
- "Tarrant County is requesting a court investigator position. The drug court is the only criminal District Court that does not have an investigator assigned to the court."
- "These two clerks are responsible for preparing all court documents and maintaining court files. A full time clerk is indispensable to the operations of full time courts." [44]

Aside from the obvious intent of the Commissioners' Court to establish a fully functioning Criminal District Court is the clear intent to create a court whose purpose is to assist the district attorney's office in the prosecution of drug offenses. The mandate that the Commissioners' Court has imposed on Trial Court C is to increase the dollar amount of fines imposed, to impose longer prison sentences and eschew probation, and to increase the ratio of convictions to acquittals and dismissals.

The following sentence illustrates the basis for my concern in the two cases before us: "[T]he collection of increased fines will act as a deterrent, as will the imposition of sentences requiring confinement." [45] Indeed, the project was originally and continues to be entitled the "Enhanced Drug Prosecutions/Drug Court."

The need expressed in the program narrative is a valid one. Tarrant County is in need of additional forums so that felony cases

---

41. *See National Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 590–91, 69 S.Ct. 1173, 1177, 93 L.Ed. 1556, 1567 (1949) ("The doctrine of separation of powers is fundamental in our system. It arises, however, not from Art. III nor any other single provision of the Constitution, but because 'behind the words of the constitutional provisions are postulates which limit and control'."); *United States v. Brown*, 381 U.S. 437, 442–43, 85 S.Ct. 1707, 1712, 14 L.Ed.2d 484, 488 (1965) ("The Constitution divides the National Government into three branches—Legislative, Executive and Judicial. This 'separation of powers' was obviously not instituted with the idea that it would promote governmental efficiency. It was, on the contrary, looked to as a bulwark

against tyranny"); *Mays v. Fifth Court of Appeals*, 755 S.W.2d 78, 83 (Tex.1988) ("[E]ven without an express constitutional provision, the separation of powers doctrine is nevertheless an unquestioned fundamental of the federal system");. *see also* THE FEDERALIST, No. 47 (James Madison).

42. *See* TEX. CONST. art. I, §§ 3, 19, art. II, § 1.

43. Def.Ex. 9 at CJD–2.

44. Def.Ex. 3.

45. Def.Ex. 1 at 26.

can be processed expeditiously. Yet when continued funding for Trial Court C depends on a quantitative analysis that attempts to measure its "success," an appearance of impropriety is created.

Leslie J. Smith, Criminal Justice Manager for the County Administrator, explained the objective criteria for determining the effectiveness of Trial Court C.[46] Alarmingly, these objective criteria include the ratio of conviction to acquittals, the average length of prison sentences, and the value of property forfeited. These criteria are also included in the grant documents.[47] Specifically, the County stated in the section of the application entitled "Proposed Project Activities" that:

> Among the measures that Tarrant County expects to use as a means to gauge the success of the Drug Court are: 1) Backlog of Cases; 2) Dispositions by Type (e.g. convictions, acquittals, dismissals, etc.); 3) Numbers of Trials; 4) Length of Sentence.[48]

The section also provided that Trial Court C would process all forfeiture cases in Tarrant County. Additionally, it emphasized the County's intent to closely align Trial Court C with the prosecutors:

This project coordinates activities closely with the Tarrant County Narcotics Task Force (TCNICU). The prosecutors assigned to the Drug Court work at the central office of TCNICU and work hand-in-hand with all the TCNICU personnel.[49]

One sign of this close working relationship between the court and the State is the *ex parte* meetings held between the presiding judge and the Task Force prosecutors to determine which cases will be tried the following week.[50] When asked if the defense attorneys are invited to these meetings, Rachel Flores, Court Coordinator for Trial Court C, stated, "I'm sure they are welcome, but they are not notified to be there." [51]

The section of the grant application entitled "Proposed Evaluation Design" also is revealing:

> The level of achievement for the activities and goals for the 1993–1994 grant year (June 1 through May 31) has been exemplary and is projected as follows:
>
> 1. Felony narcotics cases disposed: 918 (The average case assigned to this court is disposed of in less than one year)
>
> 2. *All* asset forfeiture cases are handled in this court.

**46.** The majority claims that this dissenting opinion "us[es] evidence which is not supported by the record." Op. at 143 n. 2. I would respectfully point out that Leslie J. Smith testified that funding is for one year. Successive renewals are dependent on the court's performance, as measured by the objective criteria. *See* Smith, Test., R. at 48:

> Q. How long is each grant given for? Is it one year or two years?
> A. It's one year. It's renewable at the end of each year based on your progress reports and how well you are operating your particular court.

Although Smith testified that he didn't really worry about the conviction rate, *see* R. at 56, lines 10–14, he also testified as follows:

> Q. The second paragraph of that program narrative says that, "Tarrant County expects to use as a means to gauge the success of the drug court several factors. One of these is dispositions by type." It says convictions, acquittals, dismissals.
> Can you explain to us why the conviction/acquittal ratio would be used in determining the effectiveness of Trial Court C?
> A. There's all different things that I would personally look at as a manager of this court,

and definitely the most important thing that I look at is the disposition—the number of cases that would be given a disposition and the number of pending cases.
R. at 55, lines 16–25, and at 56, lines 1–3.
Smith also testified in regard to the conviction/acquittal ratio:

> Q. It [the conviction/acquittal ratio] is one of the factors that is going to be used, according to your narrative here, to *evaluate the success of the drug court;* is that correct?
> A. Yes, sir.

R. at 56 (emphasis added).
*See also* Def.Ex. 9 at CJD–13; Def.Ex. 7 at CJD–14; Def.Ex. 1 at 4 (*Commissioners' Court, Communication about Fiscal Year 1991 Criminal Justice Grant with Accompanying Resolutions,* March 21, 1991).

**47.** *See* Def.Ex. 7 at CJD–13.

**48.** *Id.*

**49.** *Id.*

**50.** *See* Rachel Flores, Test., R. at 165.

**51.** *Id.*

3. Dispositions by type:

Convictions: 828 (Including Probations)
Dismissals: 71
Acquittals: 3

These figures demonstrate that over 90% of cases assigned to this court are resolved other than dismissal or acquittal.

4. Number of jury trials: 31

This total exceeds the number of jury trials in five of the regular courts (and doesn't consider all of the asset forfeiture cases processed).

5. Length of sentence:

The average sentence length of persons sentenced to the penitentiary after jury trials is 53.2 years. (However, this figure is somewhat inflated in that in one jury trial one defendant received five separate sentences of 70 years each).[52]

Besides being disturbing, the funding of Trial Court C also clashes with article 16, section 61 of the Texas Constitution. That section declares that

[a]ll district officers in the State of Texas and all county officers in counties having a population of twenty thousand (20,000) or more, according to the last preceding Federal Census, shall be compensated on a salary basis.[53]

The El Paso Court of Appeals has faced this issue squarely in holding that a defendant is entitled to a recusal hearing when challenging the judge assigned to a similar court.[54] As the El Paso court has noted, this scheme "raises very serious questions about the neutrality and impartiality of any judge assigned to preside over such a court, and deriving income from such assignment."[55]

## Civil Drug Forfeiture Proceedings

Fisher waived his complaint concerning his forfeiture case. Dharmagunaratne, however, did not. We should therefore address the forfeiture issue regarding Dharmagunaratne, even if only to examine it in light of his complaint that the court is unconstitutional in its operation.

Chapter 59 of the Texas Code of Criminal Procedure deals with the forfeiture of contraband. Article 59.05 requires that all parties comply with the civil rules of pleading and that all cases proceed to trial in the same manner as other civil cases.[56]

Rule 22 of the Texas Rules of Civil Procedure provides that a civil suit in the district or county court shall be commenced by a petition filed in the office of the clerk.[57] Article 59.04 of the Texas Code of Criminal Procedure requires the State to file its petition "not later than the 30th day after the date of the seizure."[58] Rule 23 of the Texas Rules of Civil Procedure mandates that the suits be numbered consecutively.[59] It is the duty of the clerk to designate the suits by regular consecutive numbers and to mark the file number of the cause on each paper in every case.[60] Rule 24 provides that "[w]hen a petition is filed with the clerk he shall indorse thereon the file number, the day on which it was filed and the time of filing, and sign his name officially thereto."[61]

Additionally, section 51.303 of the Texas Government Code sets out the duties and the powers of the clerk of the district court. Among those duties and powers is the requirement that the clerk of a district court shall record the acts and proceedings of the court. Specifically, section 51.303 provides:

The clerk of a district court has custody of and shall carefully maintain and arrange

52. Def.Ex. 7 at CJD–14.

53. TEX. CONST. art. 16, § 61.

54. *See Sanchez,* 926 S.W.2d at 396.

55. *Id.*

56. *See* TEX.CODE CRIM.PROC.ANN. art. 59.05(a), (b) (Vernon Supp.1997).

57. *See* TEX.R.CIV.P. 22.

58. TEX.CODE CRIM.PROC ANN. art. 59.04(a) (Vernon Supp.1997).

59. *See* TEX.R.CIV.P. 23.

60. *See id.*

61. TEX.R.CIV.P. 24.

the records relating to or lawfully deposited in the clerk's office.[62]

Section 51.309 of the Government Code permits the district court to appoint a deputy clerk.[63] Each appointment must be in writing under the hand and seal of the district court and must be recorded in the office of the county clerk.[64] A deputy clerk is required to take the oath prescribed for officers of the State of Texas, and may perform in the name of the district clerk all official acts of the office of district clerk.[65]

Generally, all civil cases in Tarrant County are file-marked by a deputy district clerk. The deputy district clerk file marks the petition, showing the date of filing, makes sure that an adequate filing fee accompanies the petition, assigns a case number, and then places the petition either into document production, if service is requested, or directly into the court. The assignment to a ·civil district court is computer-generated, unless the document is already attached to an existing case.[66] The computer generates both the court designation and the cause number. Court assignments are random.[67]

### Tarrant County's Handling of Forfeiture Cases Violates Article 59.05 of the Texas Code of Criminal Procedure

In contrast to the way all other civil cases are filed in Tarrant County, narcotics forfeiture cases are not assigned to a court randomly. Instead, shockingly, they are assigned manually by the *district attorney's investigator*.[68]

Norman Wyatt, an investigator for the district attorney's office of Tarrant County, testified that he is assigned to the asset forfeiture unit of the Tarrant County Narcotics Intelligence and Coordination Unit.[69] His duties include taking the asset forfeiture petitions to the district clerk's office for filing. He has his own desk in the district clerk's office. He testified, "There is not a clerk that sits there, but it's in the clerk's office. I use it every day. If someone else comes in there, such as from auto theft or whatever, to file a case, then they [sic] would use that desk, also."[70]

Wyatt marks each copy of a petition with the cause number and the court number.[71] He also file-marks the petitions.[72] He testified, "*I will go ahead and put the certified stamp, put the date, and seal that, and then I will stamp each copy. And I immediately give that to the District Clerk representative there at that time.*"[73] After Wyatt completes his job, *he* has the deputy clerk initial the time stamp.[74]

Nowhere does our law permit a party to act as a clerk in filing its own lawsuits. The record does not reflect that any member of the district attorney's Narcotics Task Force was ever sworn as a deputy clerk. Yet when narcotics forfeiture cases are brought to the district clerk for filing, the task force has already made a court assignment for that petition. The petition is also file-marked, dated, and stamped with both the court assignment and cause number before it is ever presented to the district clerk or a deputy district clerk. I am aware of no other area of the law in which the party, whose ability to prosecute an action is statutorily limited in time, is allowed to usurp the duties of the clerk and determine the proof-of-filing-date to be affixed to the petition.

The rotation for the filing of these cases is received from the district attorney's office.[75]

---

62. Tex.Gov't Code Ann. § 51.303(a) (Vernon Supp. 1997).

63. *See id.* § 51.309(a).

64. *See id.*

65. *See id.*

66. *See* Lisa Arnesen, Assistant Manager of the Civil Section, Test., R. at 193–94.

67. *See id.*

68. *See* Norman Wyatt, Test., R. at 223–34.

69. *See id.* at 223.

70. *Id.* at 225.

71. *See id.* at 224.

72. *See id.*

73. *Id.* (emphasis added).

74. *See id.* at 228.

Despite the fact that Tarrant County has ten purely civil district courts,[76] exclusive of the family and juvenile courts, forfeiture cases are filed only in those five general district courts that both give preference to criminal cases and send drug forfeiture cases to Trial Court C–the 213th, 297th, 371st, and 372nd District Courts and Criminal District Court No. 4. Trial Court C is the only court in which narcotics forfeiture cases are heard in Tarrant County. The record does not reflect any reason for all narcotics forfeiture cases to be heard in Trial Court C except that the District Attorney's Narcotics Task Force investigator designates the trial court in which the forfeiture cases are filed.[77]

The procedures employed by the State in filing the civil forfeiture case against Dharmagunaratne violated the standards, rules, and procedures for filing a civil lawsuit. The procedures thereby violated the requisites of article 59 of the Texas Code of Criminal Procedure and denied Dharmagunaratne the fundamental constitutional protections of due process, equal protection, and separation of powers.

Because Dharmagunaratne did not agree to try this cause by consent and because he made timely objections to the manner in which the civil forfeiture was filed, we should address his complaint and hold that the operation of the court as to these two defendants is unconstitutional. I would also hold that any challenge to the operation of a court not raised pretrial is waived.

## CONCLUSION

Fundamental to the concept of due process is the right to trial conducted before an impartial magistrate in a lawfully created court in conformity and compliance with the law of the land. The surrender of all responsibility for these two cases to Trial Court C violated these basic guarantees. On the limited facts presented to us and in regard to Appellants only, we should reverse the judg-

ment of the trial court denying habeas corpus relief.

---

**75.** See Mary White, Deputy District Clerk of the Felony Civil Division, Test., R. at 185.

**76.** See Arnesen, Test., R. at 193.

**77.** See Wyatt, Test., R. at 186–87.